**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KAREN E. HORTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 3:11-00112 |
| v. | ) JUDGE KIM R. GIBSON |
| | ) |
| AMERWAY, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER OF COURT

### I.     SYNOPSIS

This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc. No. 38), which Plaintiff opposes. For the reasons that follow, the Court will **DENY** Defendant's motion.

### II.     JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and 42 U.S.C. § 2000e-5(f)(3). Venue is proper under 28 U.S.C. § 1391(b).

### III.     BACKGROUND

This case arises out of Plaintiff, Karen E. Horton's ("Horton"), allegations that her employment with Defendant was terminated in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), as amended by the Civil Rights Act of 1991. (Doc. No. 1 at ¶ 1). Plaintiff claims she was terminated for her refusal to engage in a protected activity under the Act. (Doc. No. 1 at ¶¶ 15-16).

1

Defendant, Amerway, Inc. ("Amerway), is a family-owned company headquartered and based out of Altoona, Pennsylvania. (Doc. No. 42-1 at ¶ 2). The company is closely held by Gerry Buck, Terry Buck, and Laura Link. (Doc. No. 42-5 at 5-6). Terry Buck and Laura Link are Gerry Buck's son and daughter, respectively. (Id.). Amerway currently employs 20 full-time workers and 3 part-time workers. (Doc. No. 42-1 at ¶ 3). Gerry Buck resides in California. (Doc. No. 42-2 at 18). Defendant maintains that Gerry Buck does not "participate extensively in managing the Company's day-to-day operations." (Doc. Nos. 43 at ¶ 3; 42-2 at 11-12). Rather, Terry Buck was responsible for day-to-day operations, including acting as general manager and plant manager, as well as performing various duties including purchasing, procurement, sales, personnel hiring, personnel training, and other responsibilities. (Doc. Nos. 42-1 at ¶ 4; 42-2 at 3-7). Horton, however, contends that Gerry Buck had a more hands-on approach, and that when he would be in Pennsylvania, Gerry Buck "took over much of Terry Buck's job, including day-to-day operations." (Doc. No. 54-1 at ¶ 17).

Plaintiff was hired as an at-will employee on February 25, 2008. (Doc. No. 42-3 at 5). According to Defendant, because of a financially strong year in 2007, Plaintiff was hired to assist Terry Buck with various projects and administrative duties. (Doc. No. 42-1 at ¶ 5). Plaintiff maintains that her hiring was done in response to the departure of the previous purchasing agent, and a backlog of work due to Terry Buck's inability to manage the workload alone. (Doc. No. 54-1 at ¶¶ 4, 6). Defendant states that Plaintiff's job was mostly clerical, primarily assisting Terry Buck with research and other administrative projects and miscellaneous tasks, along with providing other assistance as needed. (Doc. No. 42-6 at 4-8). Plaintiff has asserted that her job responsibilities primarily involved purchasing, inventory, "everything encompassed under procurement," and providing other assistance as needed. (Doc. Nos. 48-1 at 32; 54-5 at 1-2).

2

It is undisputed that Amerway had issues with frequent employee turnover and poor employee attendance. (Doc. No. 42-6 at 11). According to Defendant, to combat the issue, Gerry Buck approached Plaintiff to search for employees who could be hired full-time. (Doc. Nos. 42-6 at 13-15). Defendant advances that the request was only general, with no grant of hiring authority or commitment to new hires at all. (Doc. No. 42-5 at 16-17). Plaintiff agrees that Gerry Buck approached her to research hiring more workers; however, Plaintiff avers that Gerry requested "Mexican" workers, because he believed Mexicans were "good workers" and "never miss work." (Doc. No. 48-1 at 48-49). Plaintiff believed that the conversation was serious, and that Gerry Buck was expecting progress reports. (Doc. No. 48-1 at 49).

While in California, Gerry was impressed with the work ethic of day laborers he saw. (Doc. No. 42-5 at 15). Defendant argues that it was for this purpose that he made the request to Plaintiff. (Doc. No. 42-5 at 15). Defendant maintains that Gerry Buck used "Latino" and "day workers" interchangeably based on his personal experience in California, and that what he was intending to convey was a search for reliable employees. (Doc. Nos. 42-5 at 10; 42-6 at 15). However, Plaintiff argues that Gerry Buck specifically asked for "Mexicans" and that Gerry understood day workers to "encompass all Latinos." (Doc. Nos. 48-1 at 48-49; 50-1 at 37-38).

At Gerry Buck's request, Plaintiff contacted an outside agency, Manpower, on October 22, 2009, seeking "legal immigrants, preferred Mexicans." (Doc. No. 48-1 at 56). As Plaintiff noted in an October 22, 2009 email to Gerry Buck sent just before 11:30 a.m., Manpower informed Plaintiff that preference due to national origin or race opened the possibility of a lawsuit. (Doc. No. 54-2 at 1). She also sent this email to Terry Buck the same day at 12:40 p.m.; however Terry Buck asserts that he did not read the email. (Doc. No. 42-2 at 8-9). Plaintiff counters, though, that Terry Buck did indeed read her email, and responded to her on October 22,

3

saying "Go ahead and send it. Maybe he will go to his local Home Depot and buy a plane ticket to Pennsylvania for one of them." (Doc. No. 49-1 at 41). Gerry Buck responded the next day, October 23, 2009, to Plaintiff's email, and told her that he did not want to do anything illegal. (Doc. No. 54-2 at 1).

Plaintiff was terminated on October 26, 2009, 4 days after the email exchange with Gerry Buck. (Doc. No. 48-1 at 73). After a prosperous 2007 and early 2008, Defendant alleges that business began to decline in late 2008, in tandem with the souring of the U.S. economy in general. (Doc. Nos. 42-1 at ¶ 6; 43 at ¶ 8). Defendant states that this downturn caused Gerry and Terry Buck to consider reducing the workforce, including employees Carl Betsinger and David McConnel, in addition to an IT position. (Doc. No. 42-1 at ¶ 8). Defendant avers this reduction in workforce came to include Plaintiff, since Terry Buck could absorb her job responsibilities, and could not replicate the skills of the IT position. (Doc. No. 42-2 at 12). Defendant maintains that Terry Buck was solely responsible for the personnel decisions, and made the decision in September 2009, but delayed it due to it being "unpleasant." (Doc. Nos. 42-1 at ¶ 11; 42-2 at 10-11, 14-15).

Plaintiff maintains that the timing concerning when Terry and Gerry Buck began discussing a reduction in the workforce is inconsistent in the record. (Doc. Nos. 54-7 at 2; 54-9 at 1). They point to facts indicating that Gerry began advocating a workforce reduction starting in December 2008, as based upon the position statement given to the EEOC. (Doc. No. 54-9 at 1). Supplemental information provided to the EEOC, however, states the initial proposal to eliminate Plaintiff's position was made in late August or September 2009. (Doc. No. 54-7 at 2). Further, Plaintiff contends that Terry Buck did not absorb her work, which was pushed to Christine Davis. (Doc. No. 54-9 at 2-3). Plaintiff further disputes that other workers were laid

4

off. (Doc. No. 54-8 at 1). Plaintiff also disputes that Terry Buck was solely in charge of making the determination to terminate her employment, and that in fact, Gerry Buck made the final decision after the October 21-23, 2009 email exchange, and subsequently informed Terry Buck that Terry should carry out her termination. (Doc. No. 48-1 at 74).

Defendant filed this motion for summary judgment (Doc. No. 38) along with its supporting memoranda (Doc. No. 39), concise statement of material facts ("CSMF") (Doc. No. 40), and accompanying appendix of exhibits (Doc. No. 42). Plaintiff responded by filing an opposing memoranda (Doc. No 47), responsive CSMF (45), counter statement of facts (Doc. No. 46), and accompanying appendix of exhibits (Doc. Nos. 48-54), to which Defendant filed a reply (Doc. No. 55) and response to Plaintiff's counter statement of facts (Doc. No. 56). This motion has been fully briefed and is now ripe for disposition.

## IV.    STANDARD OF REVIEW

"Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56 (a).[1] Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those which will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248.

---

[1] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a). The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment, "may not rest upon the mere allegations or denials of the . . . pleading," but, "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (internal citations omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); see also *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

## V.    DISCUSSION

Amerway argues that summary judgment against Horton is appropriate in this case because, under the *McDonnell Douglas* framework for a Title VII retaliation claim, Plaintiff is unable to establish that Defendant's non-retaliatory reason for termination of Plaintiff's employment was pretext, and that Horton would be unable to establish that retaliation for her engagement in the protected activity was a motivating factor for her dismissal. (See Doc. No. 39 at 9-13). Specifically, Defendant argues Horton cannot establish any evidence of pretext under either of the two prongs of the *Fuentes* test to defeat summary judgment. (See id. at 12-20).

6

## A. Retaliation Under Title VII[2]

Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Such unlawful employment practices under Title VII include printing or publishing, or "caus[ing] to be printed or published any notice or advertisement relating to employment ... indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin," except where such a preference, "is a bona fide occupational qualification for employment." 42 U.S.C. § 2000e-3(b). "The anti-retaliation provision [42 U.S.C. § 2000e-3(a)] seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct," whereas, "[t]he anti-discrimination provision of Title VII [42 U.S.C. § 2000e-2(a)] seeks to prevent injury to individuals based on who they are, *i.e.*, their [protected] status." *Sampath v. Concurrent Technologies Corp.*, 2008 WL 868215 at *34 (W.D. Pa. March 31, 2008) (internal quotes omitted) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345, 356 (2006)).

When asserting a claim of retaliation, a plaintiff may prove her claim by either producing direct evidence of retaliatory treatment, or as under the *McDonnell Douglas* framework, by producing circumstantial evidence that would allow a reasonable fact-finder to infer retaliation. See *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005); *McDonnell Douglas Corp. v. Green*,

---

[2] Retaliation claims under Title VII and PHRA are analyzed under the same legal standards, and because so the Court's discussion here of Plaintiff's Title VII claims applies equally to her PHRA claims. See *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) (noting that, "[c]laims under the PHRA are interpreted coextensively with Title VII claims."); see also *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996).

7

411 U.S. 792 (1973). "In the absence of direct evidence of retaliation (*i.e.,* a defendant's admission of a discriminatory animus), analysis of a retaliation claim must proceed under the three (3) step burden shifting process," that first requires the plaintiff to establish a *prima facie* case of retaliation. *In re Olick*, 422 B.R. 507, 541 (Bankr. E.D. Pa., Dec. 28, 2009) (internal citations omitted). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must offer evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). "If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Id.* at 342 (internal quotes omitted). If the employer does so, then "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (internal quotes omitted).

When analyzing the burdens that an employee and employer must bear under the *McDonnell Douglas* framework when an employer moves for summary judgment, courts in this Circuit are guided by *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). Here, Amerway's motion for summary judgment assumes "that Plaintiff can establish a *prima facie* case of retaliation ...."[3] (Doc. No. 39 at 10). Consequently, Amerway argues that it can articulate a legitimate, non-retaliatory reason for the elimination of Plaintiff's position. (See Doc. No. 39 at 10-13). Carrying this burden of production is "relatively light," and the employer need only

---

[3] Amerway notes, however, that "Defendant does not waive its right to assert any of its defenses against any claim by Plaintiff that she can establish a *prima facie* case of retaliation," and that for purposes of summary judgment, Defendant's "analysis in this Brief focuses on the fact that Plaintiff cannot satisfy her burden of proving that Amerway's stated reasons for eliminating her position were pretext." (Doc. No. 39 at 10 n.3).

"introduce[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763.

Once Amerway articulates a nondiscriminatory reason, Horton "must respond by citing evidence that the rationale is pretextual." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes*, 32 F.3d 759). In order to create a genuine dispute of material fact as to whether Amerway's proffered reason is pretextual, Horton must "point to some evidence, direct or circumstantial, from which a factfinder *could* reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted) (emphasis in original). Plaintiff need not "adduce evidence directly contradicting the defendant's proffered … explanations," but she must present enough evidence to "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (citation omitted) (emphasis in original).  In other words, Horton must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).  Thus, Horton "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal citations omitted); see also *Sampath v. Concurrent Technologies Corp.*, 2008 WL 868215 at *35 (W.D. Pa. March 31, 2008) (noting that "[p]roof of inconsistencies might be used either to

9

establish the prima facie case or to demonstrate pretext in the third step of *McDonnell Douglas* ....").

As stated above, when bringing a Title VII retaliation claim, if a plaintiff sufficiently rebuts the employer's proffered reasons as pretext for the termination, the plaintiff must also show "that retaliation was the real reason for the adverse employment action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997); see also, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 2753-54, 125 L.Ed.2d 407 (1993) ("It is not enough ... to disbelieve the employer, the factfinder must believe the plaintiff's explanation of intentional discrimination.") (emphasis omitted); *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1067-68 (3d Cir.1996) (en banc) (explaining how plaintiff may satisfy burden), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). "The plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Krouse*, 126 F.3d at 501 (citing *Woodson,* 109 F.3d at 931-35). The burden of proof remains at all times with the plaintiff. *Id.* at 920 n. 2. Thus, in order to obtain summary judgment,

> the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process and (2) that it had a determinative effect on the outcome of that process. This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation. *See Jalil,* 873 F.2d at 708 (explaining shifting burdens under Title VII retaliation); *see also Stewart,* 117 F.3d at 1287 (explaining shifting burdens under ADA retaliation).

*Krouse*, 126 F.3d at 501.

Here, Defendant argues that it can meet its burden of producing a legitimate, non-retaliatory reason for its decision to terminate Plaintiff's position. Specifically, Defendant avers that, "the downturn of the Company's business in 2009, the resulting need to reduce costs, and the reduced workload of Plaintiff's position," came together to inform Terry Buck's decision to eliminate Plaintiff's purchasing agent position. (Doc. No. 39 at 11). Plaintiff disputes this rationale and contends that Defendant's proffered reason is pretext for retaliation against her unwillingness to follow through with the alleged discriminatory hiring instructions as assigned to her by Gerry Buck. (Doc. No. 47 at 6).

Amerway's proffered rationale for Plaintiff's termination is the downturn of Company business in 2009 and the related company cost-cutting and reduction in Horton's overall workload. (See Doc. No. 39 at 10). Specifically, Defendant contends that in late 2008 and throughout 2009, Amerway "suffered a dramatic downturn," which led to significant decreases in the company's total sales and net business income. (Id.). Because of these business woes, the company took the step of reducing its overall costs. (Id. at 10-11). Part of the cost reduction strategy included a reduction of Amerway's workforce. (Id. at 11). Defendant contends that, in total, the Company eliminated three positions in 2009, which figured into an overall reduction in workforce during that period "by 17%, from 29 to 24 full-time employees." (Id. at 4). Specifically, Defendant avers that the decision to eliminate Plaintiff's purchasing agent position was premised on Terry Buck's determination to eliminate either that position or an IT position. (Id. at 3). And because the duties of Plaintiff's position could be absorbed by existing staff more easily than those of the IT technician, Terry Buck chose to eliminate Horton's position. (Id.).

Supporting its contention that Amerway "began suffering a considerable decline in its business," in 2008, Defendant points to sworn declarations made by Terry Buck and Gerry Buck

11

that the company's business suffered as a result of the downturn in the national economy starting in the fall of 2008. (Doc. No. 40 at 10). Defendant contends that this led to a significant drop in the company's sales and profits in 2009. Deposition testimony by Terry Buck also indicates that the determination to lay off employees at that time was because of "the considerable downturn in the economy." (Doc. No. 42-2 at 12). While Defendant also points to testimony by Horton acknowledging that she knew of the "meltdown in the economy in the United States," Plaintiff disputes the contention that this provided her with "firsthand knowledge" of how it affected the company's finances. (Doc. Nos. 48-3 at 42-43; 45 at 20). Indeed, Horton testified that, "[i]t seemed that our end was still strong for a very long time." (Doc. No. 48-1 at 43).

To corroborate its contention that the overall decline in the economy resulted in poor economic performance for Amerway, Defendant points to the changes in its ordinary business income and gross sales as listed in its 2007, 2008, and 2009 federal income tax returns. Specifically, "ordinary business income" fell by 64 percent from 2007 to 2008 and "gross sales" fell by 34 percent from 2008 to 2009.[4] Plaintiff disputes any inference that these numbers influenced Defendant's decision to terminate her, and in fact alleges that the downturn in the economy did not have any noticeable effect on "Amerway's business in terms of the amount of product that they were able to sell or a decline in their business." (Doc. No. 42-6 at 11). It is important to note for summary judgment purposes that it is not necessarily what Plaintiff *knew*

---

[4] Defendant's stated decline in "ordinary business income" from 2007 to 2008 could be construed to overstate its claim of business decline from 2007 to 2008 because, as the income tax return filings indicate, "gross receipts" increased by 12 percent. Even further, with "gross profits" decreasing by 22 percent, "total income" decreasing by 21 percent, and "total deductions" increasing by 43 percent, the overall picture becomes a bit more complex. (See Doc. No. 43). Similarly, while "gross sales" may have decreased by 34 percent from 2008 to 2009, Defendant's tax returns indicate that "gross profits" actually increased by 7 percent, "total income" increased by 10 percent, and "ordinary business income" increased by 88 percent from 2008 to 2009. (See id.). This would otherwise appear to present a contradictory assessment that Defendant's financial situation was so dire as to warrant severe employee reductions as part of an overall cost-cutting strategy.

about the effect of the economy on the company's business that is important, but rather what actually did occur—*i.e.*, whether a declining economy did, in fact, have an a significant negative impact upon company business. Despite Defendant's contention that there was a serious decline in business, it is important to note Plaintiff's observation of the lack of a significant impact in her role as purchasing agent, coupled with the varying business indicators as listed in Defendant's 2007 through 2009 tax returns. Given these disparate factual averments, it would be perfectly reasonable to question the actual overall health of Amerway's business activity during the 2007 to 2009 time period, as well as any related impact upon Plaintiff's work duties.

Similar to Defendant's averment that the overall economy impacted its business, Terry Buck also stated that during this time period, it "lost several governmental grants that provided revenue for the company." (Doc. Nos. 40 at 11; 42-1 at 3). Plaintiff disputes the characterization that the company "lost" these government grants. (See Doc. No. 45 at 21). Rather, she argues that Amerway *chose* not to re-apply for these grants, and because so, the loss was not necessarily a product of a declining business, but rather a purposeful business decision. Indeed, in Horton's affidavit, she explains that "Terry Buck advised me that Gerry Buck had instructed him not to apply [sic] any government grants in 2009." (Doc. No. 54-1 at 2).

Both Terry Buck and Gerry Buck stated in their declarations that the company also took cost-cutting measures in response to the economic downturn. (See Doc. Nos. 42-1 at 3; 43 at 3). Specifically, Defendant argues, decisions were made to eliminate all non-essential travel, streamline the inventory system, defer major purchases, and restructure sales compensation. (See id.). Horton, however, avers these steps were not taken because of the economic downturn, but rather were undertaken for more practical business reasons. As she stated in her affidavit, "[w]hen I took over the purchasing responsibilities for Amerway, Inc., I worked very hard to find

13

better prices for products that Amerway, Inc. purchased regularly and implemented a 'just-in-time' inventory system to save the company money." (Doc. No. 54-1 at 1-2). Even further, she testified that during her first six months with the company, she "saved them thousands of dollars," in carrying out her responsibilities as Amerway's purchasing agent. (Id. at 2).

Finally, Defendant contends that the economic downturn led the company to consider the idea of a workforce reduction, which in turn resulted in several layoffs, including that of Plaintiff. While Defendant avers that Gerry Buck and Terry Buck began discussing the possibility of a workforce reduction in the spring of 2009 (See Doc. No. 40 at 12),[5] Plaintiff disputes this contention and points to the Defendant's EEOC Position Statement submitted in February 2010, and a January 2011 supplemental information submitted by Defendant to the EEOC. (See Doc. No. 45 at 23). Specifically, Plaintiff argues that while the 2010 Position Statement indicated that Gerry Buck had "advocated a reduction in the number of Amerway employees, due to business being down ...," from around December 2008, Terry Buck's only consideration of workforce reduction was with respect to Horton, which began with an "initial proposal in late August or early September 2009 ...." (Doc. Nos. 54-9 at 1; 54-7 at 2). While Defendant's CSMF avers that the discussion to reduce staff started in the "spring of 2009," the above record evidence contradicts this.

Despite this discrepancy over timing, Defendant also contends that in order to reduce costs and sustain economic viability, Terry Buck "was solely responsible for making and

---

[5] Defendant's CSMF, ¶ 41 alleges that this fact is present in the record in Gerry Buck's deposition at Doc. No. 42-5 at 12-13 (pages 52-53 of the deposition) and in Terry Buck's deposition at Doc. No. 42-2 at 11-12 (pages 64-65 of the deposition). While Gerry Buck testified that they were considering layoffs at the end of the first quarter 2009," and not necessarily the spring of 2009, the cited pages of Terry Buck's deposition gives no indication as to the precise time when they started talking generally about layoffs after the economy began to decline. At best, Terry Buck's deposition testimony would indicate that the only conversation concerning layoffs was one related only to Horton and not the company in general, and that this conversation occurred in September 2009. (See Doc. No. 42-2 at 11).

carrying out all decisions regarding the reduction of the Company's workforce." (Doc. No. 40 at 12). Gerry Buck indicated as much when he testified that Terry Buck was the sole decision-maker as to workforce reduction because, "[h]e's the boss. He has the authority. He also has the power to make the decisions. I don't pass on the power to do things and then second-guess what he does. He makes his own decision." (Doc. No. 42-5 at 14). As Plaintiff points out, however, Defendant's supplemental information to the EEOC indicated that, "[a]fter Terry Buck made his suggestion [to layoff Horton], Amerway's other shareholders ... eventually concluded that Terry Buck's suggestion was appropriate ...." (Doc. No. 54-7 at 2). Plaintiff also testified during her deposition, that after being told by Terry Buck that she was terminated, she asked why, and he responded that, "Gerry called over the weekend, and you're to be terminated." (Doc. No. 48-1 at 74).[6]

With regard to the reduction in workforce, Terry Buck indicated in his declaration that among the positions that were eliminated were those of Carl Betsinger, a production employee in June 2009, and David McConnell, another production employee, in September of 2009. (See Doc. No. 42-1 at 3). Plaintiff, however, argues that these employment positions were not eliminated, and while Mr. Betsinger may have been laid off, Plaintiff disputes whether Mr. McConnell was actually let go. Horton points to Amerway's notification[7] to the EEOC of the various employees that were separated from the company, which included a notation that Mr. Betsinger was fired for poor workmanship, rather than having his position eliminated as the

---

[6] Plaintiff also testified in another instance that she knew the decision had been made over the previous weekend before her termination because, "Terry told me [Horton], Gerry called me over the weekend. I have to lay you off." (Doc. No. 48-1 at 79).

[7] Marked as Defendant's exhibit 14. See Doc. No. 54-8.

result of a broader staff reduction measure. (See Doc. No. 54-8).[8] Additionally, Plaintiff disputes Amerway's contention that Mr. McConnell's position was eliminated because his name does not even appear on the EEOC notification of separated employees. (See id.).

Horton's affidavit tells a different story than that of broader economic forces necessitating upper level decisions to engage in workforce restructuring efforts. Horton states that she was hired to replace the company's prior purchasing agent and that upon commencement of her employment had to deal with a large backlog of purchasing work. (See Doc. No. 54-1 at 1). Over the entire time of her employment at Amerway, Horton claims that her workload was consistent and while she received assignments from both Terry Buck and Gerry Buck, she ultimately reported to Terry Buck about her work. (See id. at 2). Horton also stated that in October 2009—at the time when Defendant claims it was looking to cut staff—Gerry Buck instructed her to find additional workers for the company. (See id. at 3). Finally, Horton states that despite the company's decision not to re-apply for government grants in 2009, she nonetheless had a steady flow of work that remained consistent throughout her tenure with Amerway. (See id. at 2).

In essence, Horton and Amerway tell two different stories about the economic situation at the company throughout late 2008 and 2009 leading up to Plaintiff's eventual termination. A factfinder who gives credence to Horton's testimony could conclude that even though the national economy had witnessed a significant downturn prior to Horton's termination, the company business, while perhaps not as positive as in years prior, was nonetheless strong enough to keep purchasing work at a steady level. Even further, a factfinder could reasonably conclude that despite the downturn in the national economy, the laying-off of some other employees

---

[8] According to Terry Buck, this accompanying document was not prepared by him, but rather by Laura Link, as part of a request from the EEOC wanting, "to know every employee that was hired or terminated from a certain date [i.e., from when Karen Horton was hired onwards]." (Doc. No. 52-1 at 88).

around the same time as Horton, was not necessarily based on a strategic decision-making process aimed at workforce reduction, but rather routine terminations due to poor employee performance. This would seem to paint a contradictory picture since Defendant contends that the reasoning behind Gerry Buck's request to hire immigrant workers was for the purpose of finding permanent employees who should show up consistently. Such a purpose is inconsistent with a cost-cutting strategy that aimed to reduce the overall workforce. Indeed, a factfinder could surmise that Terry Buck's decision to assimilate Horton's job duties to himself and other employees does not necessarily translate into the elimination of the purchasing agent position and its duties. In other words, the re-delegation of a terminated employee's duties and workload does not necessarily translate into the elimination of the duties and workload for that position. Finally, a factfinder could reasonably doubt whether the decision to terminate Horton was the ultimate product of a longer strategic process, through which the final decision was placed solely in the hands of Terry Buck and had entirely nothing to do with Plaintiff's interactions with Gerry Buck.

Because Horton's proffered evidence relates to the economic circumstances of the company leading up to her termination, it necessarily involves core facts relevant to Amerway's explanation for the elimination of her position and termination of her employment. See *Kautz*, 412 F.3d at 467. In essence, a reasonable factfinder who believed Horton's affidavit and other proffered evidence could find "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," in Amerway's explanation as to deem it "unworthy of credence." *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr, and Solis-Cohen*, 983 F.2d 509 at 531 (3d Cir. 1992)) (internal quotes omitted). In other words, this Court finds that it is entirely possible for a reasonable factfinder to be able to "infer 'that the employer did not act for [the asserted] non-

17

discriminatory reasons.' " *Id.* (quoting *Josey v. John R. Hollingsworth Corp.* 996 F.2d 632, 638 (3d Cir. 1993)). Thus, the Court's analysis here leads to the conclusion that Amerway's proffered reasoning for its termination of Plaintiff's position has been successfully challenged by Horton at the summary judgment stage because she has pointed to sufficient inconsistencies and weaknesses in Defendant's explanation for why she was terminated.

Under the third step of the *McDonnell Douglas* framework, Plaintiff would be required to show at trial that Defendant's proffered reason for her termination is false, and that retaliation against her for engaging in the protected activity was a motivating factor for her termination (*i.e.*, that retaliatory animus played a role in the decision-making process and that retaliatory animus had a determinative effect on the outcome of that decision-making process). See *Krouse*, 126 F.3d at 501. In order to survive Defendant's motion for summary judgment on the retaliation claim, however, Plaintiff need only demonstrate either that there is sufficient evidence to call into question the employer's proffered reasons for the adverse employment action, or, that there is sufficient evidence to allow a factfinder finder to conclude that retaliatory animus was more likely than not a motivating or determinative cause of the adverse employment decision. See *Fuentes*, 32 F.3d at 765; see also *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (explaining that "[b]ecause the plaintiff bears the burden of persuasion in Title VII actions, a defendant is entitled to summary judgment if it can demonstrate that the plaintiff could not carry the burden of proof at trial"). As analyzed above, the Court found that Plaintiff has made a sufficient rebuttal of Amerway's proffered reasons, meeting the first part of the *Fuentes* examination; however, while Defendant maintains that Plaintiff is unable to call into doubt its proffered non-retaliatory reasons, it also argues that Horton is unable to provide any evidence allowing a reasonable factfinder to conclude that retaliatory animus played a determinative role

18

in the decision to terminate her. (Doc. No. 39 at 17). The Court, however, need only find that Plaintiff can sufficiently meet one of the two *Fuentes* prongs to defeat Defendant's motion for summary judgment; nonetheless, the Court will assess Defendant's averment that Horton cannot set forth sufficient evidence of retaliatory animus as a motivating factor of her termination.

Here, Amerway argues that Horton is unable to show that retaliation was the real reason for her termination. Specifically, Defendant contends, "Plaintiff relies entirely on the four-day temporal proximity of her October 22, 2012 e-mail to Gerry Buck and her October 26, 2012 separation," from the company, which alone, is insufficient to demonstrate retaliatory animus under Third Circuit case law. [9],[10] (Doc. No. 39 at 11-12). Plaintiff disputes Amerway's contention and argues that she "can rely on much more in the record than the timing between her

---

[9] Defendant also asserts that, in accordance with the second prong of the *Fuentes* test, Plaintiff must prove evidence of Defendant's "discriminatory or retaliatory" animus, and cites *Simpson v. Kay Jewelers Div. of Sterling, Inc.*, 142 F.3d 639 (3rd Cir. 1998), in order to specify the types of evidence that can be used for this purpose (*i.e.*, "(i) evidence of prior discrimination against the plaintiff; (ii) evidence that the defendant had previously discriminated against other employees within the plaintiff's protected class; and (iii) evidence that the employer treated similarly situated employees outside of the protected class more favorably than the plaintiff."). The *Simpson* case, however, does not apply here because under the facts of that case, the Court was analyzing a Title VII claim for discrimination, not retaliation. Here, Horton's claim is one of retaliation, not discrimination. Thus, under the second prong of the *Fuentes* test, where Defendant asserts that summary judgment is appropriate because pretext cannot be demonstrated by the Plaintiff for a claim of Title VII retaliation, "the defendant may win summary judgment by showing that the plaintiff could not produce sufficient evidence of pretext to rebut an assertion of nondiscriminatory reasons for the discharge." *Jalil*, 873 F.2d at 707. Therefore, at issue here is whether Amerway can show that Horton is unable to demonstrate that there was more than just temporal proximity between the protected action and her termination, so as to rebut Amerway's proffered economic rationales for its decision to eliminate her position.

[10] It should be additionally noted that, while Defendant's analysis of the second prong of *Fuentes* falls under the wrong evidentiary standard since Plaintiff has alleged a claim for Title VII retaliation—and not discrimination—Defendant has previously assumed in its motion—for purposes of summary judgment—that Plaintiff can sufficiently establish a *prima facie* case of retaliation, see *supra*, n.3, (Doc. No. 39 at 10), which would necessarily establish a causal connection between Horton's participation in a protected activity and her subsequent termination from Amerway. Thus, it would seem that by conceding Plaintiff's *prima facie* case, Defendant has foreclosed itself to arguing that Plaintiff cannot meet its burden under the second prong of *Fuentes* because such a causal connection can be construed as evidence of an impermissible motivating factor of her termination. Despite this seemingly contradictory legal argument, the Court will nonetheless entertain Defendant's argument for the second prong of *Fuentes* (although using the proper standard for retaliation claims).

termination and her protected activity," including disputed facts regarding who, in fact, was responsible for making the final decision of her termination.[11] (Doc. No. 47 at 8). In evaluating claims for retaliation, "timing and ongoing antagonism have often been the basis for the causal link," but plaintiffs may "substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). This evidence may include inconsistent reasons for termination, a pattern of antagonism, "temporal proximity between the events plus inconsistencies in the defendant's testimony, certain conduct towards others, and refusals to provide a reference for the plaintiff." *Id.* at 281. Essentially, there are "no limits on what [courts] have been willing to consider." *Id.*

In the Third Circuit, the "case law is seemingly split as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection ...." *Id.* at 279 (internal quotes omitted). "[T]his 'split' is not an inconsistency in our analysis but is essentially fact-based," and courts rule differently "depending, of course, on how proximate the events actually were." *Id.* For a court to find a

---

[11] Additionally, Horton avers that under *Fuentes*, in order for the Plaintiff to meet its burden on summary judgment, it "need not present evidence that Defendant's proffered reasons were false *and* that retaliation was the real reason. Rather, she may prevail by *either* discrediting Defendant's proffered reasons, circumstantially or directly, *or* by providing evidence, whether circumstantial or direct, that retaliation was more likely than not a motivating or determinative cause of the adverse employment action." (Doc. No. 47 at 9) (emphasis in original). Inasmuch as the *McDonnell Douglas* standard for Title VII retaliation claims requires 1) the plaintiff to make a *prima facie* showing of retaliation, 2) the Defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action, and 3) the Plaintiff to rebut this reason as pretextual by proving that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process," *Krouse*, 126 F.3d at 501, with regard to the last step of the analysis for the purpose of a defendant's summary judgment motion, "in order to create a genuine issue of material fact as to whether the proffered reasons are pretextual [Plaintiff] must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." (quoting *Fuentes* 32, F.3d at 764). In other words, as discussed above, Plaintiff must prove its case in the conjunctive on the third step in order to obtain relief, but can withstand dismissal on summary judgment by meeting its burden on only one of the two elements of the third step under *McDonnell Douglas*.

sufficient causal connection based on temporal proximity, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Krouse*, 126 F.3d at 503 (internal quotes omitted). "There is no bright line rule as to what constitutes unduly suggestive temporal proximity," but "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation ...." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007). A gap of two days between the protected activity and a plaintiff's discharge, on the other hand, is unduly suggestive. See *Jalil*, 873 F.2d at 708.

In this case, the temporal proximity between Horton's allegation of engaging in a protected activity and her termination could allow a reasonable factfinder to infer that Amerway retaliated against her. Horton claims that on Thursday, October 22, 2009 she notified Gerry Buck by email that she was uncomfortable of pursuing management's desire to hire immigrant workers for Amerway because she believed it was illegal after being informed as such by outside consultants. She avers that only a few days later on Monday, October 26, 2009 she was terminated from her position as a result of not agreeing to engage in this protected activity. The crux of her retaliation claim focuses on the close temporal proximity of five days—about two to three business days—of her engagement in this protected activity and her termination from Amerway.

A court should be cautious, however, when inferring causation based on temporal proximity alone. See *Sampath*, 2008 WL 868215 at *48 (finding a sufficient causal connection where there was a two month gap between protected activity and adverse employment action with additional evidence of antagonism). As in *Sampath*, other alleged evidence may be considered by a reasonable factfinder to bolster Horton's retaliation claim in addition to the

21

presence of temporal proximity. Defendant does not deny the fact that Gerry Buck asked Plaintiff to conduct research concerning hiring certain types of workers[12] by contacting local companies concerning such employment possibilities; however, Amerway does aver that Plaintiff's underlying premise for Horton's retaliation claim is flawed because the decision to terminate her was made exclusively by Terry Buck about a month prior to her alleged engagement in this protected activity. Defendant contends that Horton is unable to meet her burden of showing that retaliation was the real reason for her termination because Horton cannot dispute the fact that the decision was made in September 2009, solely by Terry Buck, and in no way was the decision related to her interactions with Gerry Buck.

To support this claim, Defendant avers that Terry Buck had determined in September 2009 that Plaintiff's position would be eliminated, but did not carry through with this decision until about one month later. Defendant points to discussions between Terry Buck and his wife, Rachel Buck. Ms. Buck testified that her husband asked her whether they should invite Plaintiff to their annual "apple party," that was scheduled for October 10, 2009, because Terry Buck knew that Plaintiff's position was being eliminated and he wanted to know whether it would make for an uncomfortable situation.[13]

---

[12] Gerry Buck testified that "he had described the workers he sought as 'day workers,' 'migrant workers,' and 'Latino workers.' " (Doc. No. 39 at 5). While the term, 'day workers,' may not necessarily implicate a Title VII cause of action, the terms "migrant workers," and "Latino workers," can be construed to fit within the confines of a Title VII retaliation claim because these terms could be understood to refer to a person's national origin or race. See 42 U.S.C. § 2000e-3(a), (b).

[13] Presumably, Terry Buck's "uncomfortable feeling," concerning whether to invite Horton to the apple party was based on his knowledge that if they invited her to the party on October 10, 2009, it would be only a short while after the party that Plaintiff would be terminated from Amerway. Terry Buck's allegedly "uncomfortable feeling" concerning extending an invitation to someone who would soon be fired, attempts to frame the termination decision as a pre-October 22, 2009 determination, but does little to show that it was a decision made solely by Terry Buck. Even further, the Defendant's assertion—that this fact highlights Plaintiff's inability to demonstrate that retaliation was the determinative factor for her termination—overlooks the possibility that even if a termination decision had been made prior to Plaintiff's engagement in the protected activity, her engagement in the protected activity coupled with a

While Plaintiff agrees that she was indeed invited to the October 2009 apple party for the first time during her tenure at Amerway, she disputes Defendant's assertion that the decision to terminate her had been made prior to that. Pointing to testimony she provided regarding her discussion with Terry Buck when she was being terminated, she alleges that Terry Buck told her at the October 26, 2009 termination meeting that he had spoken with Gerry Buck over the prior weekend—after the alleged protected activity took place—and that Gerry Buck had instructed him to terminate her. Indeed, Horton's testimony indicates that when she pressed Terry Buck for a reason as to why she was being terminated after he had talked to Gerry Buck, Terry was unable to reply with an answer. At the heart of the matter, a reasonable factfinder might ask, if Terry Buck did indeed make the decision to terminate Horton in September 2009, then why did he wait until October 26, 2009 to carry out the decision, especially if the company was planning on having other employees absorb Plaintiff's job duties? Even further, if such a decision had been made *solely* by Terry Buck in September 2009 prior to any alleged protected activity, why then would he decide to terminate her only after discussing the issue with Gerry Buck, but at the same time be unable to provide Plaintiff any reason—even though he was not necessarily required to provide her with an explanation for the termination.

Under these circumstances, it is perfectly reasonable that the factfinder could determine that despite Amerway's claim that a termination decision had been made prior to October 22, 2009, that when coupled with such a close time proximity, Horton has provided sufficient evidence showing that Amerway's decision to terminate her was likely motivated by a retaliatory animus against her unwillingness to pursue discriminatory hiring directives. For these reasons,

previously determined termination decision could still provide her with a factual basis for asserting a Title VII retaliation claim. In other words, just because a decision to terminate her had been made prior to the protected activity occurring does not necessarily override the protections afforded to her under the statute once she engaged in the protected activity prior to being terminated. See *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 311 (3d Cir. 2012).

the Court finds that there exists a genuine dispute of material fact as to the underlying reasons as to whether Defendant's termination action against Horton was a pretext for retaliation.

## VI.  CONCLUSION

Plaintiff has alleged that her rights were violated under Title VII and the PHRA, based on claims of retaliatory action taken by her employer. Defendant's motion for summary judgment sought a dismissal of both of these claims, and for the reasons set forth in this Memorandum, the Court will **DENY** Defendant's motion for summary judgment. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KAREN E. HORTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 3:11-00112 |
| v. | ) JUDGE KIM R. GIBSON |
| | ) |
| AMERWAY, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

**AND NOW**, this 19th day of July 2013, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 38), and in accordance with the Memorandum, **IT IS HEREBY ORDERED** that the motion is **DENIED**.

BY THE COURT:

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**